1  Dan Stormer, Esq. (S.B. #101967)
   Virginia Keeny, Esq. (S.B. #139568)
2  HADSELL STORMER KEENY
       RICHARDSON & RENICK, LLP
3  128 North Fair Oaks Avenue
   Pasadena, California 91103-3645
4  Telephone: (626) 585-9600
   Facsimile: (626) 577-7079
5  Email: dstormer@hadsellstormer.com
   Email: vkeeny@hskrr.com
6
   Attorneys for Plaintiff
7  Michael Holguin

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12

13  MICHAEL HOLGUIN,                    )  Case No: CV 10-8011-GW(PLAx)
                                        )
14            Plaintiff,                )  Assigned to the Honorable Paul. L.
                                        )  Abrams
15       vs.                            )
                                        )  **PLAINTIFFS' OPPOSITION TO**
16  COUNTY OF LOS ANGELES, LOS          )  **DEFENDANTS' EX PARTE**
    ANGELES COUNTY SHERIFF'S            )  **APPLICATION FOR PROTECTIVE**
17  DEPARTMENT, SHERIFF LEE BACA,       )  **ORDER BARRING DEPOSITIONS**
    DEPUTY RICO, DEPUTY FERNANDO        )  **OF BACA, CLARK AND TANAKA;**
18  LUVIANO, DEPUTY LASCANO,            )  **MEMORANDUM OF POINTS AND**
    AND DOES 1-20,                      )  **AUTHORITIES**
19                                      )
              Defendants.               )  [DECLARATION OF VIRGINIA
20                                      )  KEENY AND EXHIBITS IN
                                        )  SUPPORT THEREOF FILED
21                                      )  CONCURRENTLY HEREWITH]
                                        )
22                                      )
                                        )
23                                      )
                                        )  Complaint Filed:    October 25, 2010
24                                      )  Discovery Cut-Off: November 3, 2011
                                        )  Motion Cut-Off:    None Set
25                                      )  Trial Date:         February 28, 2012
                                        )
26                                      )

27

28

# TABLE OF CONTENTS

**Page(s)**

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    FACTUAL ALLEGATIONS AND DISCOVERY TO DATE. . . . . . . . . . . . . . . 1

III.   PROCEDURAL HISTORY RELATING TO THIS MOTION. . . . . . . . . . . . . . 5

IV.   FACTUAL BASIS FOR DEPOSING BACA, TANAKA, CLARK
AND CONTE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Sheriff Baca.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      B.    Paul Tanaka . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    John Clark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.     LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    PLAINTIFF IS ENTITLED TO DEPOSE DEFENDANT BACA. . . . . . 14

      B.    CLARK, CONTE AND TANAKA ARE NOT HEADS OF
           GOVERNMENT AGENCIES AND ARE SUBJECT TO DEPOSITION
           LIKE ANY OTHER INDIVIDUAL.. . . . . . . . . . . . . . . . . . . . . . . . 17

VI.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*Adickes v. S.H. Kress & Co.*
    398 U.S. 144, 167-68(1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Avalos v. Baca*
    2006 U.S.Dist. LEXIS 79376  (C.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . 16

*Bagley v. Blagojevich*
    486 F.Supp.2d 786 (C.D.Ill. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chew v. Gates*
    27 F.3d 1432 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Detoy v. City & County of San Francisco*
    196 F.R.D. 362  (N.D.Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*DiMarzo v. Cahill*
    575 F.2d 15 (1st Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Genesis Insurance Co. v. Wausau Insurance Companies*
    343 F.3d 733 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Green v. Baca*
    226 F.R.D. 624 (C.D.Cal. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Griffin v. State of Md.*
    378 U.S. 130, 84 S.Ct. 1770 (U.S.Md. 1964). . . . . . . . . . . . . . . . . . . . . . . . 17

*Henry v. County of Shasta*
    132 F.3d 512 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hopper v. City of Pasco*
    241 F.3d 1067(9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kyle Eng. Co. v. Kleppe*
    600 F.2d 226 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Oklahoma City v. Tuttle*
    471 U.S. 808, 823-24(1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Prisma Zona Exploratoria De Puerto Rico, Inc. v. Calderon*
    154 F.Supp.2d 245 (D.P.R. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ruffin v. Los Angeles County*
    607 F.2d 1276 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Telemundo of Los Angeles v. City of Los Angeles*
    283 F. Supp. 2d 1095(C.D. Cal. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Tower Press Building, Inc. v. White, D.C.Ohio*
    165 F.R.D. 73 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wilson v. Layne*
    526 U.S. 603, 119 S.Ct. 1692 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# I.  INTRODUCTION

Defendants' *ex parte* application for a protective order, barring the depositions of Sheriff Baca, Undersheriff Tanaka, Captain Clark and Commander Conte should be denied.  As an initial matter, these depositions were first noticed a month ago; defendants have had more than enough time to comply with the local rules and bring a properly noticed and briefed motion for a protective order.  Relying on the ex parte procedure, especially one filed on the eve of a holiday weekend, defendants clearly intended to gain an unfair advantage over the plaintiff and his counsel.  Second, only one of these individuals, Sheriff Baca, is even arguably entitled to protection from subpoena under federal law.  The other three, as commanders of the jails and/or responsible for the day to day operations of the sheriff's department, are not entitled to the immunity of "high ranking government officials" from submitting to deposition.  Finally, even if plaintiff were required to establish the personal involvement of each of these individuals to justify the deposition of higher ranking officials, as defendants argue, plaintiff can establish as to each that he has personal knowledge of the system of inadequate oversight, training and discipline which has led to the constitutional violations alleged here.

## II.  FACTUAL ALLEGATIONS AND DISCOVERY TO DATE

This action was filed on October 25, 2010 by Michael Holguin, who was severely beaten by Sheriff's Deputies while in custody at Los Angeles County Men's Central Jail ("MCJ").  Mr. Holguin was detained at MCJ beginning on or about October 6, 2009 and placed in a single man cell on the 3500/3700 floor because his father had been a member of the command staff in the LAUSD police department. It is undisputed that he gave none of the guards any trouble preceding the beating and that throughout his history of various incarcerations for minor offenses, he has never posed a discipline problem while in custody.  Mr. Holguin testified as follows about the incident: He did not receive a shower for the first two weeks of his custody, and complained about this (along with several other inmates) to one of the sergeants on duty.  On October 18, 2009, he was told

1   that he would receive a shower later that day.  Instead, when his turn came, Mr. Holguin

2   was informed by Deputy Luviano that he would not receive a shower.  When Mr.

3   Holguin asked why, Deputy Luviano instructed Mr. Holguin to turn around, handcuffed

4   him through the barrier gate, and removed him to a screened section of the jail tier where

5   no inmates on the row could observe what was happening.  After taking him to this

6   concealed area, Deputy Luviano slammed Holguin into the bars and hit him several times

7   with his fist in the stomach.  Deputy Luviano then hit Mr. Holguin over the head with his

8   flashlight.  Deputy Holguin continued to beat Mr. Holguin when he fell to the floor,

9   landing blows to Holguin's head and legs with his flashlight.

10        At this point, Deputy Ortega arrived at the scene and kicked Holguin in the back

11   and stomach several times with his knee or his boot.  Deputy Luviano also sprayed

12   pepper spray in Holguin's eyes and rubbed it in with his thumb.  Other deputies arrived

13   during this incident but none intervened to stop the use of excessive force by Deputies

14   Luviano and Ortega.  One or more deputy continued to hit Holguin even after Holguin

15   was pepper sprayed.

16        Deputy Luviano's version of events as testified to at his deposition is inherently

17   incredible.  Deputy Luviano claims that a nearly naked Holguin, standing in his boxer

18   shorts and shower slippers and handcuffed behind his back, asked to be taken to an

19   isolated area where none of the other inmates would see him, where he proceeded to

20   attack Deputy Luviano by kicking him in the shin with his slipper, while saying "I'm not

21   going to take this anymore."  While Holguin completely denies this version of events,

22   Deputy Luviano admits that he hit Holguin as hard as he could several times in the

23   stomach with his fist and then tried to take Holguin down to the floor.  Luviano further

24   admits that he began to hit at Mr. Holguin with his flashlight during this process, striking

25   him several times on the legs and breaking his right leg and doing severe damage to his

26   left knee.  Luviano also admits that he continued to punch Holguin, and that he pepper

27   sprayed him.  While Deputy Luviano does not admit to hitting Holguin on the head with

28   the flashlight, the photos the department took of the injury within a few hours of the

1   assault, clearly show a strike to the head which could only have been caused by a heavy

2   instrument.  This is especially troubling given that a battery to the head would run

3   contrary to Sheriff's Department training to not hit suspects in "vital areas" such as the

4   head.  Keeny Decl., ¶ 8.

5        Deputy Ortega admitted at his deposition that when he arrived at the scene, he

6   found a nearly naked man (Holguin), without shoes, hands handcuffed behind his back,

7   and who had already had his leg broken, his knee torn apart, and had received multiple

8   blows to the torso and a blow to the head from a flashlight.  Nonetheless his response

9   was to kick Mr. Holguin several times in the back and abdomen.  Keeny Decl., ¶ 9.

10       As a result of injuries suffered from the Deputies' attack, Mr. Holguin received

11  eight suture staples in the central region of the top of his head, and four stitches to his

12  right eyebrow at the Twin Towers Correctional Facility.  When medical staff discovered

13  that he had a broken tibia, Mr. Holguin was transferred to L.A. County – USC Medical

14  Center, where his right leg and angle were put in a cast. Keeny Decl., ¶ 10.

15       After returning to MCJ, Holguin was placed on a 29 day loss of privileges, as

16  punishment for his supposed wrong doing.  While his leg was still in a cast, Mr. Holguin

17  was placed in a cell without grab bars or other assistive equipment, and was routinely

18  denied use of crutches or a wheel chair by the guards.  He often had to choose between

19  dragging himself around his cell on his hands, or putting weight on his fractured tibia,

20  which caused severe pain.  Mr. Holguin had to limp even to conduct basic necessities

21  such as using the toilet. This denial of medically necessary equipment led to humiliation

22  and further emotional distress.  All but one of the prison guards ignored his pleas for

23  help in moving around his cell.  While the prison staff tried to get the District Attorney

24  to press charges against Mr. Holguin, the DA refused to do so and all charges were

25  dropped.  Keeny Decl., ¶ 11.

26       Deputy Luviano admits that he began working in the jails before receiving any

27  training.   He further admits that he received no training on when it is appropriate to use

28  pepper spray.   And while the Sheriff's Department did provide training that hard metal

1   flashlights should be used as a weapon only as a "last resort", to "protect a Deputy",

2   Luviano beat Holguin with a flashlight even while Holguin was handcuffed and not

3   resisting.  Deputy Luviano has been involved in at least two additional "use of force"

4   incidents after Mr. Holguin's beating, one of which will be the subject of a criminal trial

5   in approximately one month, and the other of which featured recently in a report

6   prepared by the ACLU, detailing physical abuse of inmates by deputies in the MCJ.

7   Keeny Decl., ¶ 8.

8          Deputy Ortega has an even more problematic tenure with the Sheriff's Department.

9   He had 7-10 incidents of "use of force" prior to the incident with Holguin.  He also was

10  arrested while with the Sheriff's Department for threatening a bar employee in Fullerton

11  with physical violence.  After being asked to leave, Ortega reportedly told the bouncer

12  that he would come back with other deputies from the 3000 floor and kill him.  When the

13  sheriff's department learned of this arrest (later that same evening), they did nothing and

14  Ortega remained in the jail without counseling, or additional supervision.  Only after the

15  local television news (KTLA) broke the story and aired a video of the bouncer describing

16  the threats of violence directed at him by deputy Ortega more than a year later, did the

17  Sheriff's department do an investigation and demote Ortega to a "custody assistant" at

18  the Twin Towers facility.  Despite the demotion in terms of pay, Ortega at his deposition

19  admitted that his job is unchanged and he continues to supervise inmates in the same

20  way as a deputy.  At his deposition, Deputy Ortega gave testimony which seemed

21  patently incredible, for example, testifying that he had no memory of 1) the incident in

22  Fullerton; 2) any of the 7-10 use of force incidents prior to the Holguin incident; 3) any

23  training he had been given; 4) the voluntary training he supposedly had provided to

24  sheriff's deputies regarding anger management after the Fullerton incident; 5) his dates

25  of employment; and 6) his promotions and demotions.  Keeny Decl., ¶ 9.

26         Defendant Sheriff Department proceeded to conduct a sham investigation into the

27  events surrounding the beating of Mr. Holguin.  Staff on the 3000 floor interviewed Mr.

28  Holguin with other guards present on the night of the beating, but failed to correctly

audio record what he said.  They then pulled several inmates out of their cells and questioned them in front of guards.  Not only was the sound portion of the tape also corrupted, but the inmates are clearly intimidated and lying so as not to earn the enmity of the deputies involved (on whom they were completely dependent during their incarceration).  Further, although the Internal Affairs investigator interviewed Holguin, Ortega and Luviano, he accepted Luviano and Ortega's version of events without question; the IA investigator did not check to see whether Luviano or Ortega had prior complaints against them by inmates or whether there had been prior '"use of force" incidents by these officers; despite Ortega admitting that he had 7-10 prior "use of force" incidents, the IA officer had no knowledge of these incidents; the IA officer claims that Holguin admitted that he was a gang member, but concedes that this admission was "off tape" and not recorded; the IA officer has no idea whether either Ortega or Luviano's conduct with respect to Holguin was later found out of policy or if they received any type of discipline, counseling or additional training as a result of the beating.  Amazingly, the IA officer testified at deposition that despite being in IA for many years, he had never known of any founded investigation into an excessive force incident or allegation.  Keeny Decl., ¶ 12.

Defendant's lack of discipline of problem officers will be on trial in this case, as Federal District Court Wu has ordered the County to produce all "use of force" reports for the 3000 floor of the MCJ for the two years prior to the incident.  Defendant County has produced three full boxes of reports.  While plaintiff's counsel is still in the process of reviewing them, there is no evidence yet that any resulted in any discipline.  Keeny Decl., ¶ 13.  Furthermore, as described more fully below, the ACLU has filed a report supported by scores of declarations from inmates and lay witness, as well as expert analysis, finding a pattern and practice of deputies using excessive force against inmates, without supervision, oversight or discipline.

### III.  PROCEDURAL HISTORY RELATING TO THIS MOTION

As an initial matter, there is no justification for defendant bring this matter as an

ex parte application.  Plaintiff first noticed the depositions of Clark, Tanaka and Conte on September 16, 2011.  Keeny Decl., ¶ 14.  The depositions were set for October 3, 4 and 6, respectively.  Keeny Decl., ¶ 14.  On September 19, 2011, Defense counsel Ray Sakai informed plaintiff's counsel via email that he would be out of town commencing on September 21 until October 5, and that the County would not be producing Tanaka, Conte or Clark because the County viewed them as high ranking officials immune from deposition.  Keeny Decl., ¶15.  Mr. Sakai asked that the depositions be put off until the end of October and the parties agreed upon dates in the last week of October, 2011. Keeny Decl., ¶ 15.[1] Plaintiffs agreed to this continuance due to defense counsel's representation about his schedule and in order to give defendant time to bring a properly noticed motion to quash.  Keeny Decl., ¶ 16.

While there was still more than enough time for defendant to comply with the local rules with respect to a joint stipulation for bringing a motion to compel, defendants did not do so.  Instead, defendants waited until October 8 – the eve of a holiday weekend – to file an ex parte, seeking immediate relief and preventing plaintiff from having an ordinary briefing schedule to oppose the motion. Keeny Decl., ¶ .

Prior to setting these depositions, plaintiff had attempted to obtain information about defendant's knowledge of excessive use of force in the jails and the inadequacy of the department's policies and practices with respect to responding to such violence through other discovery means than depositions of these officials.

Plaintiff had served a deposition notice on April 18, 2011, for the deposition of the "person most knowledgeable" for the County of Los Angeles.  Plaintiff's Decl., ¶20 and Exh. 6 thereto.  That deposition sought the person most knowledgeable to testify about such topics as:

- "Training and/or supervision of Sheriff's Department deputies and/or Men's

---

[1]  On September 29, 2011, plaintiff served a deposition notice on Sheriff Baca, setting the deposition for October 28, 2011, one of the dates agreed to be held by the parties for depositions of defendant's employees.  Keeny Decl., ¶ 17.

Central Jail personnel regarding use of force (including but not limited to use of personal weapons, pepper spray and/or "OC spray" and flashlights) during the calendar year 2007 through the present;"

- "policies, practices, and/or procedures in effect or used during the calendar year 2007 to the present, regarding the investigation of use of force incidents within the Men's Central Jail, including but not limited to when an investigation is initiated, how it is initiated and staffed, when photographic or other evidence is obtained and how it is maintained, how witness statements are recorded, and under what circumstances discipline is imposed;"

- "Training and/or supervision of Sheriff's Deputies and/or YOUR personnel at the Men's Central Jail regarding handling and responding to use of force incidents during the period January 2007 through the present."

Defendant has not produced anyone to respond to this deposition notice, despite requests to defendant.  Keeny Decl., ¶ 21.

On July 15, 2011, plaintiff served his Second Set of Interrogatories on Defendant County of Los Angeles.  See Keeny Decl., ¶ 22.  In that request, plaintiff referenced a Public Records Act Request dated February 1, 2011, which had been propounded by the Los Angeles Times to the Sheriff's Department. See Keeny Decl., Exh 4 thereto.   In Sheriff Baca's response to that request, Sheriff Baca had admitted that there had been 437 use of force incidents on the 3000 Floor of the MCJ in the preceding few years. *Id.*. In the First Set of Interrogatories, Plaintiffs asked for the County to identify: "all officers who were identified as having used force as part of the incident" (Interrogatory No. 4); "how many of those incidents resulted in some form of discipline being given to one or more of the deputies involved in the use of force" (Interrogatory No. 5) and "which officers received any form of discipline."  Interrogatory No. 6.  Defendant refused to respond to any of these interrogatories.  See  Keeny Decl., ¶ , and Exh. 7 thereto.

Plaintiff had also taken the deposition of the two officers involved, Deputies Luviano and Ortega, their supervisor, Sergeant Duarte, and the lead investigating officer,

Lt. Maldonado.  All disavowed any knowledge of other incidents of violence in the jails, specialized training to respond to violence in the 3000 floor, what the county's ultimate finding in the Holguin beating was, and any knowledge of the sheriff's department's policies or practices over the years with respect to implementing greater safety measures, eradicating deputy gangs, installing video cameras in the jails, or any of the other preventive measures recommended by jail monitors to combat the constitutional violations committed by deputies.  Keeny Decl., ¶ 24.

## IV.  FACTUAL BASIS FOR DEPOSING BACA, TANAKA, CLARK AND CONTE

Since Plaintiff's complaint includes a *Monell* claim for County liability, it is crucial that Plaintiffs be able to depose leading decision-makers in the LASD to determine what measures the decision makers took following reports of abuse against inmates, and judgments vindicating inmates excessive force claims in Los Angeles County Jails.  For example, in 2009, the ACLU issued a report documenting "several instances of deputies apparently using excessive force on prisoners, both in terms of when they use force and how much force is then applied."  Keeny Decl., ¶ and Exh. 8 thereto.[2]  These reports included tasing by Deputies of an inmate who was subdued with his hands behind his back and a Black inmate being beaten by Deputies while being called a "nigger bitch."  *Id.* at 11, 12.  Similarly, in 2010, the ACLU issued a report stating that the "in the five-month period from March 10 through August 10, 2010, we received more than 70 complaints of excessive and/or unjustified force, or retaliation by deputies against prisoners, or both."  Keeny Decl., ¶ and Exh. 9 thereto.[3]  Again in 2011, the ACLU issued a report on L.A. County Jails, this time with declarations of Chaplains and other civilian witnesses to violent abuse of inmates by Deputies.  This report included a statement by Thomas Parker, a former FBI Agent and Assistant Special Agent in Charge of the FBI's Los Angeles Field Office:

---

[2]Available at: http://www.aclu-sc.org/documents/view/259

[3]Available at: http://www.aclu-sc.org/documents/view/273

1
2
3
4
5
6
7
8
9
10
11
12

> Of all the jails I have had the occasion to visit, tour, or conduct investigations within, domestically and internationally, I have never experienced any facility exhibiting the volume and repetitive patterns of violence, misfeasance, and malfeasance impacting the Los Angeles County jail system. ... There is at least a two decade history of corruption within the ranks of the Los Angeles Sheriff's Department (LASD). In most of those cases, lower level deputies and civilian employees were prosecuted, but no one at the command level responsible for those employees appears to have been held accountable and appropriately punished for failure to properly supervise and manage their subordinate personnel and resources. In my opinion, this has provided the 'seedbed' for continued lax supervision, violence, and corruption within LASD and the county jails it administers.

13   *Id.* at 1. Keeny Decl., ¶ and Exh. 10 thereto.[4]

14   On July 19, 2010 the Los Angeles County Office of Independent Review reported
15   a practice in which some Sheriffs Deputies in County jails faked their reporting logs
16   using bar code scanner technology to make it appear as though they walked by a row of
17   cells to check up on inmates, when they in fact had not. Keeny Decl., ¶29, and Exh. 11
18   thereto.[5] This practice may have enabled one inmate to commit suicide, because a
19   Deputy responsible for checking up on inmates was instead at a local restaurant making a
20   "chow run." *Id.* Similarly, Plaintiff has alleged that Defendants had a practice of faking
21   the shower records of inmates, which led to Plaintiff complaining about the lack of
22   access to shower facilities and a subsequent reprisal from LASD Deputies. The practice
23   by which Sheriff's Deputies fake records, and any measures taken by Defendant Baca
24   and commanding officers John Clark, Dennis Conte and Paul Tanaka to uncover and/or
25   combat this practice is thus highly relevant to the instant case.

26
27   ---
28

[4] Available at: http://www.aclu-sc.org/documents/view/384

[5] Available at: http://laoir.com/reports/Deputy%20Vigilance%20in%20Jails.PDF

1   Several media reports have linked the Sheriffs' Deputies on the 3000 block of

2   Men's Central Jail, the same floor on which Plaintiff was incarcerated when he was

3   beaten by Sheriff's Deputies, to a group of Deputies that engages in gang-like activity.  In

4   one incident, the Deputies' group, known as the "3000 boys" allegedly attacked other

5   Deputies at a Christmas party in Montebello in 2010.  Keeny Decl., ¶ 30 and Exh. 12

6   thereto.[6]  The Los Angeles Times reported on a law suit by the two inmates who were

7   allegedly beaten, in which the victims allege that the LASD fosters, "gang-like activity."

8   Since Plaintiff was in the 3000 cell block at the time he suffered the beating giving rise to

9   the instant case, he is entitled to enquire about any efforts to uncover and combat

10  gang-like activity by Sheriff's Deputies in L.A. County jails. Keeny Decl., ¶ 31 and Exh.

11  13 thereto.[7]

12  *A. Sheriff Baca*

13  In 1996 and 1997, the U.S. Department of Justice ("DOJ") Civil Rights Division

14  investigated mistreatment of mentally ill inmates in Los Angeles County Jails.  In a letter

15  dated September 5, 1997, the DOJ noted that "[t]he Jail does not adequately investigate

16  allegations of abuse toward mentally ill inmates."  Keeny Decl., ¶ 32and Exh. 14 thereto.[8]

17  The letter goes on to cite a case in which reports of abuse were made in April, 1996, but

18  the alleged victim and Patients' Rights Advocate were not interviewed until October

19  1996.  Id.  The letter went on to note that because of the delay in interviewing witnesses,

20  "fourteen of the twenty-one mental health inmates involved in the allegations could not

21  be located."  *Id.* at p. 20.  In another case of inadequate internal investigation by the Los

22  Angeles County Sheriff's Department, an inmate "told investigators that he was beaten on

23

24  [6]Available at

25  http://www.ktla.com/news/landing/ktla-the-gang-behind-the-badge,0,4021055.story

26  [7] Available at:

27

28  http://articles.latimes.com/2011/may/05/local/la-me-deputies-lawsuit-20110505

[8] Available at: http://www.clearinghouse.net/chDocs/public/JC-CA-0002-0003.pdf

the head by two female deputies" but the investigators "do not appear to have attempted to identify the deputies through normal investigatory techniques such as checking who was on duty in that area on that day, or showing the victim pictures of female deputies in the jail to see whether he could identify the individuals he alleged beat him." *Id.*

Based on the investigation described in the letter from the DOJ, in 1999, Sheriff Baca signed a Memorandum of Agreement with the Department of Justice pledging that Sheriff's Department "[s]taff shall not be permitted to physically, verbally, or mentally abuse inmates with mental illness" and "[a]llegations of abuse of mentally ill inmates or inmates in mental health housing shall be promptly and thoroughly investigated and staff members found to have abused inmates shall be appropriately disciplined." Keeny Decl., ¶33  and Exh. 15 thereto.[9]

Given the serious allegations in the 1996 DOJ Letter, and the fact that Baca himself signed the Memorandum of Agreement pledging to thoroughly investigate allegations of abuse by Deputies, it is appropriate to depose Baca to find out what, if any, remedial measures Baca has taken in light of the 1999 Memorandum of Agreement.  Plaintiff emphasizes that the quality of LASD Internal Affairs investigation following the beating of Mr. Holguin on October 18, 2009 is at issue in this very case.  The quality of Internal Affairs investigations following incidents of alleged abuse against inmates has been under scrutiny during the entire duration of Baca's more than 12 years as Los Angeles County Sheriff, as evidenced by the 1999 DOJ Memorandum of Agreement.

While Defendants state that Sheriff Baca was not in Men's Central Jail on October 18, 2009 at the time of the incident giving rise to the instant case, Sheriff Baca's own statements leave no doubt that he is ultimately responsible for the policies in the jail.  The LASD website quotes Sheriff Baca as saying:

In response to the 78 declarations alleging criminal or administrative misconduct, I

---

[9]Available at:

http://www.clearinghouse.net/chDocs/public/JC-CA-0002-0004.pdf

1   have brought together a Special Jail Investigations Task Force consisting of 35

2   full-time investigators to thoroughly investigate each of these allegations.  While

3   some allegations were previously investigated, each will be thoroughly

4   re-investigated by this task force.  The progress of each investigation is available to

5   the Office of Independent Review.

6   Keeny Decl., ¶ 34 and Exh. 16 thereto.[10]

7        Similarly, the Los Angeles Times paraphrased Baca as saying that he hopes to

8   "show by example" that his Deputies need to listen to inmates and help them.  Keeny

9   Decl., ¶35 and Exh. 17 thereto.[11] These statements leave no doubt that Baca in fact sees

10   himself as the ultimate decision-maker and policy-maker at in Los Angeles County Jails,

11   so his testimony is relevant to Plaintiff's inquiry into the evolution of those very decisions

12   and policies.

13      *B.  Paul Tanaka*

14        Undersheriff Paul Tanaka is the highest ranking officer in the LASD after Sheriff

15   Baca.  The LASD website calls Mr. Tanaka the "second-in-command" who "will oversee

16   day-to-day operations" of the department.  These day-to-day operations include, of

17   course, the operation of Men's Central Jail, where the incidents surrounding the instant

18   case arose.  Moreover, Mr. Tanaka was "appointed to Assistant Sheriff in January of 2005

19   where he first oversaw the leadership of the Department's Custody, Corrections, Court

20

21

22   ――――――――――

23       [10]Available at:

24   http://sheriff.lacounty.gov/wps/portal/lasd/!ut/p/c5/04_SB8K8xLLM9MSSzPy8x
   Bz9CP0os3gLAwgwcjfzdDPw9Hf3dAswNjcyCDLRDwfpwK3CyRwib4ADOBro

25   -3nk56bqF2Rnpzk6KioCAMV4niQ!/dl3/d3/L2dJQSEvUUt3QS9ZQnZ3LzZfOT

26   AwMEdPQlMyRzZNOTBJQ1Q2S1Y0UDFPMzA!/?WCM_GLOBAL_CONTEX
   T=/wps/wcm/connect/lasd+content/lasd+site/home/home+top+stories/effecting+p

27   ositive+change+in+the+los+angeles+county+jails

28       [11]Available at:
   http://articles.latimes.com/2011/oct/01/local/la-me-1002-baca-jail-tour-20111002

1   and Technical Services Divisions."  Keeny Decl., ¶36 and Exh. 18 thereto.[12]  As the

2   "second-in-command" who "oversee[s] day-to-day operations" of the LASD and was

3   once Assistant Sheriff overseeing the Custody and Corrections Divisions of the

4   Department, Mr. Tanaka's testimony will be highly relevant to Plaintiff's discovery of the

5   LASD's Internal Affairs investigation process and policy changes, or the absence of

6   policy changes, that have occurred following findings of wrongdoing by Sheriffs

7   Deputies in County Jails.  Mr. Tanaka's deposition may also shed light on the operation of

8   gang-like groups of Sheriffs Deputies, since Mr. Tanaka has been alleged by the Los

9   Angeles Times to be a member, or past member, of one of these groups, the "Vikings."

10   Keeny Decl., ¶ 37 and Exh. 19, 20 thereto.[13]

11      *C.  John Clark*

12      Plaintiff is informed that Captain John Clark was at one time the Captain

13   responsible for Men's Central Jail, where the beating incident in the instant case took

14   place.  Plaintiff is informed that in 2006 or 2007 Mr. Clark was reassigned to the LASD

15   transportation division shortly after instituting a policy whereby Sheriff's Deputies in

16   Men's Central Jail would rotate between floors, in an effort to disrupt gang-like activity

17   by Deputies in who established close-knit relationships while working on the same floor.

18   Plaintiff seeks to Depose Mr. Clark to establish the circumstances surrounding any efforts

19   to disrupt gang-like activity by Sheriff's deputies during Mr. Clark's tenure as Captain

20   responsible for Men's Central Jail.  Keeny Decl., ¶ 38 and Exh. 21 thereto.[14]

21

22

23   _____

24   [12]Available at: http://la-sheriff.org/aboutlasd/execs.html#tanaka

25   [13]Available at: http://articles.latimes.com/1999/mar/24/news/mn-20461

26   *See also* http://articles.latimes.com/2007/sep/05/local/me-deputies5

27   [14]Available at:

28   http://witnessla.com/lasd/2011/admin/dangerous-jails-part-1-by-matthew-fleischer/

# V.  LEGAL ARGUMENT

## A.    PLAINTIFF IS ENTITLED TO DEPOSE DEFENDANT BACA

As an initial matter, plaintiff needs to depose Sheriff Baca as he is named as an individual defendant in this case.  In the Ninth Circuit , it is now well established that the Sheriff may be held personal liable for allowing unconstitutional violations to occur within the jail over which he was responsible if the plaintiffs can prove his deliberate indifference to such violations.  *Henry v. County of Shasta*, 132 F.3d 512, 517-21 (9th Cir. 1997) (sheriff was deliberately indifferent where county failed to correct "unconstitutional course of treatment" after being sued, and plaintiff then suffered the same constitutional deprivation); *Chew v. Gates*, 27 F.3d 1432, 1446 (9th Cir. 1994) (Chief Gates individually liable for unconstitutional use of canine units where he was "responsible for the operations of the [canine] department as a whole"); *DiMarzo v. Cahill*, 575 F.2d 15 (1st Cir. 1978) (Commissioner of Corrections could be personally liable under § 1983 based on his failure to fulfill his statutory duty to promulgate and enforce minimum standards of care and custody.)

In addition, Sheriff Baca is a critical witness on the issue of the County's liability under *Monell*.  There are three ways to meet the policy, practice, or custom requirement for municipal liability under § 1983: (1) the plaintiff may prove that a public entity employee committed the alleged constitutional violation pursuant to a formal policy or a longstanding practice or custom, which constitutes the standard operating procedure of the local government entity; (2) the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-making authority" and that the challenged action itself thus constituted an act of official government policy; or (3) the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action." *Telemundo of Los Angeles v. City of Los Angeles*, 283 F. Supp. 2d 1095, 1100 (C.D. Cal. 2003) (citing *Hopper v. City of Pasco*, 241 F.3d 1067, 1083 (9th Cir. 2001)). An unconstitutional policy need not be formal or written to create municipal liability under § 1983; however, it must be so

1    permanent and well settled as to constitute a custom or usage with the force of law.

2    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S. Ct. 1598, 26 L. Ed. 2d 142

3    (1970). Furthermore, "[p]roof of a single incident of unconstitutional activity is not

4    sufficient to impose liability under Monell, unless proof of the incident includes proof

5    that it was caused by an existing, unconstitutional municipal policy, which policy can be

6    attributed to a municipal policy maker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24,

7    105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).

8         As the official policy maker for the jail, Sheriff Baca is the person who must

9    explain what knowledge the County had about violence in the jails, what steps if any the

10   County has taken to ameliorate the problem and whether the County has exhibited

11   deliberate indifference to the rights of inmates.

12        In addressing similar requests to depose Baca and other Sheriff's in the state of

13   California, at least two courts have concluded that a sheriff is not a "high ranking

14   government official" entitled to protections from being called to give deposition or trial

15   testimony.  *Green v. Baca,* 226 F.R.D. 624 (C.D.Cal. 2005); *Detoy v. City & County of*

16   *San Francisco*, 196 F.R.D. 362, 370 (N.D.Cal. 2000) (collecting cases where sheriff or

17   chief of police deposed in California civil actions).  In *Detoy,* the court held that because

18   the chief of police was not a "high ranking official" entitled to special protection, the

19   plaintiff did not need to meet any "heightened standard of compelling need and

20   extraordinary circumstances required to depose a high official." *Id.*  In *Green v. Baca,*

21   the district court distinguished the very cases relied on by defendants here, as all

22   involving high ranking state and federal executive officers. See *Kyle Eng. Co. v. Kleppe*,

23   600 F.2d 226 (9th Cir. 1979) (Administrator of the Small Business Administration).

24        Moreover, the courts have held that where an official of the rank of Sheriff has

25   knowledge of the incidents or policies being challenged, they are subject to deposition or

26   trial subpoena like any other witness.   Directly on point is the district court decision in

27   *Green*, where the court held that Sheriff Baca would have to give testimony because he

28   had not established (and presumably could not establish) that he had no knowledge of the

1 policies being challenged by the plaintiffs in that case.  Courts have also permitted

2 depositions of high-ranking government officials on a showing that the officials approved

3 or were personally involved in matters at issue in the litigation. See, e.g., *Bagley v.*

4 *Blagojevich*, 486 F.Supp.2d 786, 789 (C.D.Ill. 2007); *see also Prisma Zona Exploratoria*

5 *De Puerto Rico, Inc. v. Calderon*, 154 F.Supp.2d 245 (D.P.R. 2001).

6  Similarly here, Sheriff Baca has provided no declaration or other evidence to

7 support his counsel's claim that he has no knowledge of this case.  Furthermore, Sheriff

8 Baca could not establish that he has no knowledge of the number of incidents in the 3000

9 floor of the MCJ, since he responded to the Public Records Act Request, providing the

10 specific number of incidents.  See Exh. 4 to Keeny Decl..  More importantly, Sheriff Baca

11 has knowledge of the County's awareness of the level of violence in the jails, the

12 County's failure to institute any new training, the County's allowance of individuals with

13 criminal records for assault to serve as deputies in the jails, and the refusal to install video

14 cameras in the jails, as recommended by jail commander Clark in 2006.  He would also

15 have personal knowledge of the County's refusal to respond to the ACLU and Special

16 Prosecutor Merrick Bobb's many reports critical of the jails for the level of violence

17 committed by deputies, the failure to investigate and the failure to discipline guards.

18  The case relied upon by defendant is not controlling.  In *Avalos v. Baca*, 2006 U.S.

19 Dist. LEXIS 79376 (C.D. Cal. 2006), the district court held that government officials

20 such as Sheriff Baca can be deposed if they "have direct personal factual information

21 pertaining to material issues in an action… [and] where the information to be gained.. is

22 not available through any other source."   Moreover, the court in *Avalos* implied that

23 plaintiff could proceed with the deposition if he first deposed "those individuals with the

24 most relevant knowledge of the facts before taking the depositions of high ranking

25 government officials." *Id.*, at *6-8.

26 / / /

27 / / /

28 / / /

**B.      CLARK, CONTE AND TANAKA ARE NOT HEADS OF GOVERNMENT AGENCIES AND ARE SUBJECT TO DEPOSITION LIKE ANY OTHER INDIVIDUAL**

Defendants have refused to produced Clark, Conte and Tanaka on the grounds that they are high-ranking government officials.  Defendants' position is not supported by the law.  Captain Clark, Commander Conte and Undersheriff Tanaka are *not* senior public officials. As defined in *Black's Law Dictionary* (7th ed. 1999), a public official is a person elected or appointed to carry out some portion of a government's sovereign powers. There is no indication that Conte, Clark or Tanaka are public officials within the meaning of this deposition.  The cases relied upon by defendants only pertain to "heads of government agencies", "governors" "cabinet officials", "agency secretaries" "ambassadors" and "attorney generals."  Moreover, even in the cases cited by defendants, public officials are obligated to provide *depositions depending on the circumstances, if the official has relevant knowledge.  Tower Press Building, Inc. v. White, D.C.Ohio* 165 F.R.D. 73 (1996); *Wright and Miller*, Federal Practice and Procedure, § 2102.  Plaintiff is aware of no case in the Ninth Circuit which has found an employee of a sheriff or police department below the rank of sheriff to qualify as a senior public official with restricted obligations to submit to deposition.  Thus, extending the requirement that plaintiff establish special necessity before he can depose the three lower ranking employees is unsupported by the case law.

In light of plaintiffs' counsel's efforts to obtain information on the practices of the jails by other means, and the various obstacles they have encountered, it is evident that more senior level policy makers need to be deposed at this time.

Finally, sheriff command staff are routinely asked to give deposition testimony in civil rights cases.  *See, e.g., Wilson v. Layne,* 526 U.S. 603, *617, 119 S.Ct. 1692, **1701 (1999); *Griffin v. State of Md.,* 378 U.S. 130, 133, 84 S.Ct. 1770, 1771 (U.S.Md. 1964); *Ruffin v. Los Angeles County, 607 F.2d 1276, 1281* (9th Cir. 1979) (deposition of Assistant Sheriff makes clear the corrections officer position was never intended to be a

1  career position within the Sheriff's Department); *Genesis Ins. Co. v. Wausau Ins.*

2  *Companies,* 343 F.3d 733, 737 (5th Cir. 2003)( Sheriff's denial of such an agreement in

3  his deposition is insufficient to justify the district court's conclusion on summary

4  judgment that one did not exist.)

5                                        **VI.  CONCLUSION**

6          For the foregoing reasons, plaintiff respectfully submits that defendant's ex parte

7  application for a protective order be denied in its entirety.  In the alternative, plaintiff

8  requests that he be allowed to depose Conte, Clark and Tanaka and, if they are unable to

9  fully respond to questions regarding the County's knowledge of violence and steps to

10  ameliorate such violence against inmates, to take the deposition of Sheriff Baca even after

11  the discovery cut off date.

12

13  DATED: October 10, 2011                 Respectfully Submitted,

14                                          HADSELL STORMER KEENY
                                               RICHARDSON & RENICK, LLP
15

16                                          By    /s/ - Virginia Keeny
17                                               Virginia Keeny, Esq.
                                            Attorneys for Plaintiff MICHAEL HOLGUIN
18

19

20

21

22

23

24

25

26

27

28